IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CHAPWOOD CAPITAL INVESTMENT MANAGEMENT, LLC | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ED BUTOWSKY | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| | ) | **TRIAL BY JURY** |
| CHARLES SCHWAB CORPORATION | ) | **IS DEMANDED** |
| CHARLES SCHWAB & CO., INC. | ) | |
| SCHWAB INSTITUTIONAL ENTERPRISE | ) | |
| CHARLES R. SCHWAB | ) | |
| WALTER W. BETTINGER, II | ) | |
| BERNARD J. CLARK | ) | |
| JOHNATHAN M. CRAIG | ) | |
| JOSEPH R. MARTINETTO | ) | |
| NIGEL J. MURTAGH | ) | |
| WILLIAM BELL | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| KEVIN LEWIS | ) | |
| | ) | |
|     Defendants. | ) | |

# COMPLAINT

Plaintiffs, Chapwood Capital Investment Management, LLC, a Texas limited liability company ("Chapwood") and Ed Butowsky, by counsel, file the following Complaint against Defendants, Charles Schwab Corporation, Charles Schwab & Co., Inc., Schwab Institutional Enterprise, and individual Schwab officers and directors,

1

Charles R. Schwab, Walter W. Bettinger, II, Bernard J. Clark, Johnathan M. Craig, Joseph R. Martinetto, Nigel J. Murtagh, William Bell and Kevin Lewis, jointly and severally.

Plaintiffs seek (a) compensatory damages and punitive damages in a sum not less than **$100,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from August 30, 2017 to the date of Judgment at the rate of five percent (5%) per year, and (c) costs – arising out of Schwab's defamation *per se*, business disparagement, tortious interference with contract and business expectancies, and breach of contract.

## I.  INTRODUCTION

For over ten (10) years, Chapwood enjoyed an excellent working relationship with Schwab.  That all changed on August 30, 2017, when Schwab precipitously terminated the relationship without notice, without any cause, indeed without any written or verbal explanation.  In August 2017, Schwab informed Ed Butowsky – Chapwood's managing partner – that "Senior Management" at Schwab wanted to have a conference call to discuss Butowsky's "political views and Trump".  There were no customer complaints.  Chapwood's performance was spectacular.  Butowsky wondered what in the world his "political views" or President Trump had to do with Chapwood's investment advisory business.  Although he was totally bewildered by Schwab's bizarre request, Butowsky agreed to the call.  The call never took place.  Rather, Schwab and its apex officials proceeded post-haste and with reckless disregard for the truth to defame Chapwood and Butowsky, disparage Chapwood's business, and intentionally and maliciously interfere with Chapwood's client relationships.  Schwab acted knowingly and without regard to the consequences of its actions.

In this case, Chapwood and Butowsky seek money damages for loss of business, income and clients, injury to good will, and the insult, embarrassment, humiliation and injury to reputation caused by Schwab's unwarranted and egregious actions.

## II.  PARTIES

1.      Chapwood is a private, closely-held investment advisor registered and in good standing with the Securities and Exchange Commission (SEC # 801-65121) and the Financial Industry Regulatory Authority (CRD # 138524).  Ed Butowsky founded Chapwood in 2005.  He is the managing partner of the firm.  Kim Sams is Chapwood's Chief Financial Officer and Butowsky's partner.  Chapwood's members are all citizens of Texas.  Chapwood's established business, good will and its considerable accomplishments are described on its website [http://www.chapwoodinvestments.com/] and in its Disclosure Brochures filed with the SEC. [*See, e.g.,* https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=493615].  For over twelve (12) years, Chapwood successfully focused on providing comprehensive financial counseling, portfolio management and investment advice to high net worth individuals and families.  Chapwood is compensated for its investment advisory services by a percentage of assets under management and it also receives performance-based fees.  Until Schwab defamed Chapwood and Butowsky and intentionally interfered with Chapwood's business in August 2017, Chapwood was a large advisory firm with a stellar reputation, growing business and assets under management of more than $237 Million.  Because of Schwab's intentional wrongdoing, Chapwood's assets under management plunged by over $45,000,000.00.  Chapwood lost over 268 customer accounts and suffered a substantial loss of income.

2.      Defendant, Schwab, is a publicly-traded corporation (NYSE:SCHW) that engages in wealth management, securities brokerage, banking, asset management, custody, and financial advisory services.   Schwab is a Delaware corporation, headquartered in California.  At December 31, 2017, Schwab had $3.36 trillion in client assets, $10.8 million active brokerage accounts, $1.6 million corporate retirement plan participants, and $1.2 million banking accounts.  As of December 31, 2017, Schwab had approximately 17,600 full-time employees.  Defendants, Charles R. Schwab, Walter W. Bettinger, II, Bernard J. Clark, Johnathan M. Craig, Joseph R. Martinetto, Nigel J. Murtagh, William Bell and Kevin Lewis ("Lewis"), are the individual officers and directors of Schwab who jointly instigated and directed the unlawful termination of the Agreement, the defamation, business disparagement and tortious interference at issue in this action.  A description of each individual Defendant's position at Schwab is published online [https://www.aboutschwab.com/leadership] and on their respective public profiles published by LinkedIn.  None of the individual Schwab officers and directors is a citizen of Texas.

3.      This action involves Schwab's deliberate decision to unlawfully terminate Chapwood's Investment Manager Services Agreement and to defame and disparage Chapwood in letters gratuitously sent by Schwab to Chapwood's existing clients *and* Chapwood's former clients.   In letters baked full of half-truths and insinuations of malfeasance, misfeasance and nonfeasance, Schwab painted Chapwood and its principals as unethical, dishonest and untrustworthy.   Schwab's tortious interference with Chapwood's business and its long-standing client relationships caused Chapwood to lose

over 268 accounts and $45,000,000.00 in assets under management.   Schwab's misconduct injured Chapwood and Butowsky's good will and reputation.

### III.   JURISDICTION AND VENUE

4.     The United States District Court for the Eastern District of Texas has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).   The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

5.     The Defendants are subject to general and specific personal jurisdiction in Texas.   They transact substantial business in Texas.   They committed multiple acts of defamation and intentional torts, in whole or part, in Texas.   They have minimum contacts with Texas such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.   Defendants' defamation was purposefully directed at Texas and was continuous and systematic.   Chapwood and Butowsky's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Texas and disparagement of a Plano-based business. *See, e.g., TV Azteca v. Ruiz*, 490 S.W.3d 29 (Tex. 2016) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984)).

6.     Venue is proper in the Sherman Division of the United States District Court for the Eastern District of Texas because Schwab and its agents published and republished defamatory statements to a wide audience that includes persons who reside within the Sherman Division.   Schwab's defamation caused substantial harm to

Chapwood and Butowsky's reputations in Texas.  A substantial part of the events giving rise to the claims stated in this action occurred in the Eastern District of Texas.

## IV.  STATEMENT OF MATERIAL FACTS

7.     On February 19, 2008, Chapwood and Schwab entered into an Investor Manager Services Agreement (the "Agreement").

8.     A true copy of the Agreement is attached as *Exhibit "A"*.

9.     Section 2 of the Agreement (General Description of Services), provides as follows:

> **General Description of Services**
> Schwab will provide you with products and services designed specifically for Investment Managers and their clientele. Such products and services include, without limitation, product and account services, administrative services and information and resource services.

10.     Section 2 of the Agreement (Relationships of Schwab, Investment Manager and Clients), *inter alia*, provides that:

> We agree that as between us, you will have primary responsibility for Client communications except for communications with Clients who are referred to you by Schwab through Schwab AdvisorSource® or other Schwab programs. Schwab has no intent to communicate with your Clients except as may be required by law, rule or regulation, as for example brokerage confirmations and account statements, and as Schwab reasonably determines necessary. Schwab will use its best efforts to limit its communications with your Clients to those designed exclusively for Schwab Institutional clientele, and as described herein. Schwab will (a) provide you with information on matters which you in your sole discretion determine to communicate to Clients and (b) use its best efforts to encourage your Clients who make inquiries to Schwab to direct these communications through you. We agree that nothing in this Agreement will limit Schwab's communications with Clients referred to you through Schwab AdvisorSource.

11.     Section 2 of the Agreement (Investment Manager's Authorization), in

pertinent part, provides that:

> You authorize Schwab to conduct such due diligence inquiries regarding you as Schwab reasonably determines necessary. Schwab will provide you with the results of such inquiries upon your request. You will promptly provide to Schwab any information reasonably requested by Schwab concerning your management of Client Accounts or your compliance with any federal or state laws.

12.     Section 2 of the Agreement (Compliance With Applicable Law) provides:

> **Compliance with Applicable Law**
> During the term of this Agreement, each of us and our employees and representatives will remain in substantial compliance with applicable federal and state laws, rules and regulations, as they may be amended from time to time, including, without limitation, making such disclosure as may be required by applicable law, rule or regulation.

13.     Section 2 of the Agreement (Termination) provides:

> **Termination**
> Either party may terminate this Agreement at any time by giving written notice to the other. Upon termination by either of us, a) Schwab will not be obligated to honor the authorizations granted to you by your Client in the respective Client Account agreements and in any written notices to Schwab; b) Client Accounts will be handled by Schwab in accordance with the termination of authorization provisions set forth in the respective Client brokerage account agreement and Schwab will consider such Client to have exclusive control over, and responsibility for, such Client Accounts; and c) Schwab will not be obligated to send you any further information with respect to Client Accounts. Upon Schwab's receipt of notice of a Client's termination of your authority with respect to a Client Account, the termination provisions of this paragraph shall apply with respect to such Client Account(s).

14.     Between February 2008 and August 1, 2017, Chapwood performed all duties and responsibilities called for by the Agreement without incident.  The business relationship between Chapwood and Schwab was excellent.

15.     On August 1, 2017, two things happened that ultimately caused Schwab to terminate the Agreement:

a.     First, at 7:23 a.m. on August 1, 2017, David Folkenflik, a media correspondent for NPR, published an article online at NPR.org entitled, "Behind Fox News' Baseless Seth Rich Story: The Untold Tale".  NPR simultaneously broadcast the story on *Morning Edition*.  [https://www.npr.org/2017/08/01/540783715/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story].  Folkenflik's August 1, 2017 article made and republished a number of false and defamatory statements about Butowsky, including:

● Fox News Network ("Fox News") and Butowsky "worked in concert under the watchful eye of the White House to concoct a story" about the death of Democratic National Committee ("DNC") staffer, Seth Rich;

● The Fox News story was a "fake news story"; and

● The Fox News story was a "deceptive story".

Folkenflik's source was Douglas H. Wigdor ("Wigdor").  In the article, Folkenflik quoted Wigdor as follows:

"Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC emails," says Douglas Wigdor, Wheeler's lawyer.

Many millions of NPR subscribers and listeners saw and heard Folkenflik's statements. Folkenflik's article – including the false narrative fabricated by Wigdor that Butowsky had colluded with the President and Fox News to publish "fake news" – was republished hundreds of times with no fact-checking whatsoever by other main stream media outlets and online newspaper publishers.  Folkenflik tweeted (published) the article to his 75,100 followers on Twitter and NPR tweeted the article to its 3,000,000+ followers, *e.g.*:



Ultimately, Folkenflik's article was tweeted and retweeted (republished) tens of millions of times on August 1, 2017 alone.

b.       Second, after leaking the false story to Folkenflik in July 2017, on August 1, 2017 Wigdor filed a lawsuit against Butowsky and others on behalf of his client, Rod Wheeler ("Wheeler").   Wigdor's lawsuit falsely stated that Fox News reporter, Malia Zimmerman, "with knowledge and support of Butowsky, fabricated two quotations and attributed them to Mr. Wheeler:

- 'My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks,' said Wheeler.'

- 'My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward,' Wheeler said.  'That is unfortunate.  Seth Rich's murder is unsolved as a result of that.'"

Wigdor made multiple additional false and defamatory statements of fact about Butowsky, including that:

- Zimmerman, Butowsky and Fox had created fake news to advance President Trump's agenda.

- Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder.  Rather, they were interested in advancing a political agenda for the Trump Administration.

- Specifically, it was Butowsky and Zimmerman's aim to have Wheeler confirm that: (i) Seth Rich was responsible for the leak of DNC emails to WikiLeaks; and (ii) Seth Rich was murdered by a Democrat operative because he leaked the emails to WikiLeaks.

- Butowsky and Zimmerman were not in this alone.  Rather, they colluded with Sean Spicer, Steve Bannon[1] and Sarah Flores to shift the blame for the DNC hacks from the Russians to Seth Rich in order to undermine reports of collusion between Russia and the Trump Administration.

---

[1]       Butowsky has not spoken with Steve Bannon in three (3) years.  Wigdor and Wheeler simply made this up to further their false narrative that President Trump was involved.

- Simultaneous with baseless claims of nonpartisanship to British regulators, Fox was contriving with Butowsky and members of the Trump Administration to publish and disseminate fake news to affect politics in America.

- Because of Fox and Butowsky's "devious scheming" British regulators have yet to provide a green light to Fox for the Sky takeover bid, and many U.K. politicians question whether Fox is capable of news dissemination in a fair and neutral manner.

- In falsely quoting Wheeler, Butowsky and Zimmerman attempted – through the publication of fake news – to accomplish what they had set out to do from the start: "solve the problem about Russians are the ones that gave the emails" and establish that "there was no collusion like trump with the Russians."

- Butowsky planned to extort Seymour Hersh in an effort to save the Fox News story.

On August 1, 2017, after setting Folkenflik lose, Wigdor cranked up his own public relations machine, and began to further defame Butowsky in main stream media.  Wigdor and Wheeler appeared on MSNBC with Ari Melber ("Melber"). [https://www.youtube.com/watch?v=VFTdWAWrocQ].  Melber republished the interview to his 38,262 Twitter followers *and* to MSNBC's 1,975,316 Twitter followers:



In addition to Twitter, the August 1, 2017 MSNBC broadcast was uploaded to MSNBC's YouTube channel – which has 689,000 subscribers.  The video was viewed over 117,000

more times.  Throughout August 2017, Wigdor continued to appear on television, where he published and republished false and defamatory statements about Butowsky. [*See, e.g.,* https://www.youtube.com/watch?v=S2BafRHiuZY (CNN Wolf Blitzer)]; [https://www.youtube.com/watch?v=d5L-NF6cDOo (CNN with Chris Cuomo)].

16.     Schwab and its Senior Management saw and/or heard Folkenflik and Wigdor's false and defamatory statements about Butowsky.

17.     Schwab and its Senior Management did absolutely no due diligence and made no effort to determine whether Folkenflik and Wigdor's statements were true.

18.     Schwab and its Senior Management blindly accepted Folkenflik and Wigdor's misrepresentations about Butowsky.  The suggestion that the President of the United States and the "Russians" (Vladimir Putin) would have colluded with Butowsky – a person unknown to either the President or Putin and with whom neither the President nor Putin has ever communicated – was preposterous.  Schwab and its Senior Management knew Wigdor and Folkenflik's representations were false.

19.     With actual knowledge of the falsity of Wigdor and Folkenflik's statements and without once considering the impact of their actions on Chapwood, its principals, and, most importantly, Chapwood's clients, the Defendants secretly implemented a plan to defame Chapwood and poach its clients.

20.     On or about August 19, 2017, Jennifer Pello, Schwab's "relationship manager", informed Butowsky that "Senior Management would like to have a call with you."  When Butowsky asked "why?", Pello reluctantly advised Butowsky that the purpose of the call was to discuss Butowsky's "political views and Trump".  Butowsky was bewildered and curious.  He did not know President Trump and had never spoken to

him.   Moreover, Butowsky's "political views" had nothing to do with Chapwood's business as a registered investment adviser and had never been questioned before by Schwab.   Except for the publicity generated by Folkenflik and Wigdor's defamatory statements, Butowsky could not imagine what Schwab's Senior Management wanted to discuss.

21.   Butowsky offered dates for a conference call, but the call never happened.

22.   Instead, beginning in late August 2017 and continuing through January 2018, the Defendants intentionally violated the Agreement by publishing multiple letters directly to Chapwood's existing clients *and* former clients – letters that are fraudulent and deceitful, laden with half-truths, and that deliberately conceal material facts.   The letters defame and disparage Chapwood and Butowsky by implication, inference and insinuation.   For instance:

a.   The letters notified clients that Schwab was terminating the Agreement and "will no longer honor any authorizations held by Chapwood and its principals, employees and agents with respect to your Schwab account".   However, Schwab concealed from clients and former clients the reason *why* the Agreement was being terminated:  that Schwab, for political reasons and to protect its own self-interest, had concluded that it no longer wanted to do business with Chapwood and Butowsky. Schwab's concealment was no small detail.   Schwab is the largest custodian of assets in the industry.   It would have been simple to advise clients and former clients that Schwab was terminating the Agreement without cause and for its own convenience.   Schwab deliberately withheld from Chapwood's clients the fact that Chapwood had done absolutely nothing wrong.   The timing of the Schwab letters, coming on the heals of the

13

false narrative published nationally and internationally by Folkenflik and Wigdor of collusion with "Trump" and Fox News, coupled with Schwab's concealment of the true reason for terminating the investment management relationship, implied, inferred and insinuated, indeed made it plainly appear to Chapwood's clients (a) that Butowsky had, in fact, colluded with the President and Fox to publish "fake news", (b) that Folkenflik and Wigdor's statements were true, (c) that Chapwood and its principals had engaged in serious malfeasance, misfeasance or nonfeasance, and (d) that there was, in fact, good cause to terminate Chapwood as Investment Manager.  The absence of explanation from Schwab created the implication and inference of serious legal and ethical wrongdoing. The letters caused consternation and panic.  Schwab's deliberate non-disclosure of the reason for the termination was intentional, fraudulent, deceitful and defamatory.

       b.     In the letters, Schwab told clients (and former clients) that if they wanted Chapwood or its representatives to continue to manage their brokerage account, "you will need to transfer your account to a broker-dealer or custodian other than Schwab".  Clients who chose to maintain an account at Schwab were informed that "[y]our statements will no longer have Chapwood listed on them and copies will no longer be sent to Chapwood".  These statements made it appear that Chapwood was so untrustworthy and so dishonest that Schwab would have nothing to do with Chapwood. In truth, it was the Defendants' goal in sending the letters to both existing clients and former clients of Chapwood to cause those clients to maintain their accounts at Schwab or open new accounts at Schwab.  By means of the half-truths and defamation in the letters, the Defendants intended to influence Chapwood's clients and cause them to do

business with Schwab.  Defendants' motive was to steal Chapwood's clients and, thereby, injure Chapwood's business.

        c.    Finally, in the letters Schwab informed Chapwood's clients and former clients that Schwab "regret[ted]" the inconvenience caused to the clients, but, Schwab emphasized, it took its "obligations as the custodian of client accounts very seriously".  These statements further implied, inferred and insinuated that Chapwood had engaged in "very serious" wrongdoing and that Schwab, as custodian of the assets, was "obligat[ed]" to terminate Chapwood.  The letters were carefully written and crafted to deceive Chapwood's clients and to cause them to question Chapwood and Butowsky's honesty and integrity.  The letters achieved their desired effect.  The Defendants discredited Chapwood and Butowsky, causing a massive outflow of assets.

23.    The Defendants' letters and Chapwood's unexplained termination placed Chapwood and Butowsky in a false and offensive light.  The Defendants knew that the letters would cast aspersion upon Chapwood and Butowsky.  It was the Defendants' intent to do so and to take Chapwood's business.  The Defendants saw the Wigdor/Folkenflik defamation as an opportunity to raid Chapwood's accounts.

24.    At the same time Defendants contacted Chapwood's clients and former clients, Defendants sent Chapwood the following letter via UPS:

Chapwood Capital Investment Management, LLC
4597 Old Pond
Plano, Texas 75024

Re:  Master Account:  08010516, 08053217, 08062123, 08083484, 08114350, 08242099, 08262362, 08266195, 08291718, 08317494, 08323850, 08367550 & 08460023

Dear Mr. Butowsky:

We are writing to inform you that, effective December 1, 2017, we are terminating the Investment Manager Service Agreement (IMSA) between Chapwood Capital Investment Management, LLC ("Chapwood") and Charles Schwab & Co., Inc. Effective with this termination, Schwab will no longer honor any authorizations held by Chapwood and its principals, employees and agents with respect to accounts at Schwab, including but not limited to the accounts identified in the Schedule attached to a copy of this letter you will receive by courier delivery.

In addition, on December 1, 2017, Schwab will close your Investment Manager Master account(s) with Schwab.

**Effective as noted below:**

(1) On December 1, 2017, pursuant to the terms of the IMSA between Chapwood and Schwab, Schwab will discontinue its investment management fee payment services to Chapwood with respect to any and all Chapwood client accounts.  This means that Chapwood will no longer be able to draw fees directly from client accounts through the Schwab investment management fee payment system.

(2) As a result of the decision made to terminate Schwab's relationship with your firm, **effective immediately**, Schwab will no longer accept and process new account opening documentation for clients of Chapwood.  Additionally, Schwab will no longer accept or process documentation to link existing Schwab accounts to the master account(s) of Chapwood.

(3)  The personal accounts of each of the principals of Chapwood held at Schwab must be moved to a broker/dealer or other financial institution of their choosing before the termination date.

Prior to sending the letters to Chapwood's clients and former clients, the Defendants did not afford Chapwood or Butowsky an opportunity to object or even to discuss the matter. The Defendants did not afford Chapwood or Butowsky the opportunity to contacts clients and let them know ahead of time that Schwab had decided to terminate Chapwood.  The Defendants' letters, therefore, came as a hammer blow to clients and former clients, many of whom did not understand why they were hearing about the termination for the first time from Schwab.   To Chapwood and Butowsky's dismay, embarrassment and humiliation, the way Schwab acted amplified the defamatory implication of the letters.

25.     After clients brought the Schwab letters to his attention, Butowsky spoke with in-house counsel for Schwab in Austin, Texas.   Schwab's attorney stated to Butowsky that "**I heard you were running from the law**".   Butowsky asked the lawyer to explain the patently false, disparaging and offensive statement.   In response, Schwab's agent told Butowsky that "I have a doctor's appointment that is more important than you. I don't have to talk to you or give you a reason".   The lawyer hung up on Butowsky. Upon information and belief, Schwab and its agents made many false, defamatory and disparaging statements to Chapwood clients and former clients who contacted Schwab directly after August 30, 2017.

26.     Butowsky pressed for an explanation of Schwab's conduct.   Eventually, he spoke with Lewis.   Lewis had no real explanation for why Schwab had decided to terminate Chapwood.   It was obvious that Schwab had no good cause to terminate Chapwood and that Schwab was doing so because of the false narrative about Butowsky's supposed collusion with "Trump".   None of the Defendants ever bothered to seek the truth.   If they had done any due diligence, they would have learned that there was no connection at all between Butowsky and Trump.   Lewis told Butowsky that "we have processes".   He alluded to an internal "alert" in December 2016 caused by an "unusually large wire" that left a customer's account.   Lewis claimed that the wire "got the attention of compliance".   That was it.   Butowsky scratched his head.   No one from Schwab ever even contacted Chapwood about this wire in 2016.   Lewis quickly moved on to something that he said occurred in *2006*.   Lewis claimed that a sales assistant at Chapwood had called Schwab with a client on the line.   Lewis said that Schwab was not sure if the person on the line was a client, but admitted, when questioned by Butowsky,

that this really was "not a problem".  Lewis then referred to something he said occurred in 2011.  A client, who was building a house, had used a wire request form to send multiple wires.  The client had simply changed the amount of the wire on the second form because all the other information remained the same.  When Butowsky asked what was wrong with this, Lewis had to admit again that there was nothing improper.  That was it.  Lewis could point to nothing that Chapwood had done or omitted to do that justified termination.  Lewis concluded the conversation by stating that "we surveyed all the Schwab people on the account, and unanimously voted to end the relationship".  Butowsky kept asking, "What did we do?  What did we do?"  Lewis had no answer.

27.     Throughout the fall of 2017, Schwab continued to send letters to Chapwood clients and former clients.  The insinuation and implication was clear – there was a real problem, an immediate danger, and clients and former clients needed to be constantly warned about Chapwood.  Chapwood received numerous emails from clients, such as the following:

---

**From:** Carmela Pinzone <cpinzone@gmail.com>
**Date:** October 28, 2017 at 11:35:57 AM CDT
**To:** Ed Butowsky <ed@chapwoodinvestments.com>
**Cc:** Amy Surh <amy@chapwoodinvestments.com>
**Subject: Charles Schwab**

Hi Ed,
I received several letters from Charles Schwab stating that they would no longer honor authorizations by Chapwood.  What is this about?

Thanks.

--
Carmela Pinzone

---

Schwab never once advised a single Chapwood's client that Chapwood and Butowsky were free of wrongdoing.  Repetition of the false and defamatory statements about Chapwood was unnecessary, insulting and malicious.

28.   Chapwood diligently searched for another broker-dealer and custodian for its clients' assets.  The process was painful.  Schwab's unexplained termination caused endless embarrassing and unanswerable questions.  Chapwood was rejected by numerous companies.  Chapwood finally secured a broker-dealer and custodian in early 2018.

29.   The Defendants' acts and omissions cast aspersion on Chapwood and Butowsky's honesty, credit, efficiency, prestige and standing in the investment advisory business.  Chapwood and Butowsky paid a huge price because of the actions of Schwab and the individual Defendants' actions.  In addition to a $45,000,000.00 loss of business and injury to Chapwood's good will, substantial increased administrative costs and other economic loss and special damages, Chapwood and Butowsky endured insult, humiliation, embarrassment and injury to their names and reputations because of the Defendants' letters and published statements.

## COUNT I – DEFAMATION *PER SE*

30.   Chapwood and Butowsky restate paragraphs 1 through 29 of this Complaint and incorporate them herein by reference.

31.   The Defendants made and published to third-parties, including clients and former clients of Chapwood, numerous false factual statements, which are detailed verbatim above, of or concerning Chapwood and Butowsky.  Defendants' statements are half-truths and, therefore, false representations of material facts relating to Chapwood's role as Investment Manager.  Considering the words themselves and all circumstances

surrounding the making and publication of the letters, Defendants' statements suggest a defamatory meaning in an indirect way, that is, by inference, implication or insinuation.

32.     The Defendants' false statements constitute defamation *per se*.   The statements accuse and impute to Chapwood and Butowsky an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment.   Defendants' statements also prejudice Chapwood and Butowsky in their profession or trade as investment advisor and manager of their clients' assets.

33.     The Defendants' false statements caused Chapwood and Butowsky to suffer actual damages, including loss and injury to business, insult, pain, embarrassment, humiliation, and injury to name and reputation.

34.     The Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

a.     The Defendants acted fraudulently and deceitfully in publishing letters to Chapwood's clients and former clients that contained half-truths and concealed material information;

b.     The Defendants concocted a story about Butowsky "running from the law" that was knowingly false, with not a shred of supporting evidence.

c.     The Defendants knew that Chapwood and Butowsky had done nothing wrong (indeed they had performed admirably for clients), yet the Defendants chose to promote a false narrative that implied dishonesty, unethical behavior and breach of duty by Chapwood and Butowsky;

d.      The Defendants had a predetermined agenda to get rid of Chapwood and Butowsky based on Folkenflik and Wigdor's false narrative and to poach Chapwood's clients, and they concealed that agenda from Chapwood's clients and former clients;

e.      The Defendants reiterated, repeated and continued to publish letters to Chapwood's clients and former clients out of a desire to hurt Chapwood and Butowsky and with reckless disregard for the consequences.

f.      The Defendants initiated the defamation and went out of their way to publish statements to clients *and* former clients.  The Defendants could have communicated termination of the Agreement privately to Chapwood.  The Defendants chose to make a public spectacle of the matter, which was calculated to insult, embarrass, humiliate and cast aspersion on Chapwood and Butowsky.

35.      The Defendants lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

36.      As a direct result of the Defendants' defamation, Chapwood and Butowsky suffered substantial damage and loss, including, but not limited to, loss of business and income, injury to good will, insult, humiliation, embarrassment, damage and injury to reputation, costs, and other out-of-pocket expenses in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT II – BUSINESS DISPARAGEMENT

37.      Chapwood and Butowsky restate paragraphs 1 through 36 of this Complaint and incorporate them herein by reference.

38.     The Defendants published false and disparaging information about Chapwood and Butowsky, which is detailed verbatim above.

39.     The Defendants knew their statements were false and acted with the specific intent to disparage Chapwood and Butowsky to clients and to cause clients to remain with Schwab.

40.     None of the Defendants' statements are privileged.  The Defendants had no right to publish false and disparaging information about Chapwood or Butowsky.  The Defendants knew of the falsity of their statements and acted with wanton, intentional and reckless disregard concerning publication.  The Defendants acted with ill-will and spite for Chapwood and Butowsky.  They intended to interfere with the economic interests of Chapwood and Butowsky in an unprivileged fashion.

41.     The Defendants' statements and actions constitute business disparagement under Texas law.

42.     The Defendants' business disparagement caused Chapwood and Butowsky to suffer and incur special damages, including loss of income and business and out-of-pocket expenses in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT III – TORTIOUS INTERFERENCE

43.     Chapwood restates paragraphs 1 through 42 of this Complaint and incorporates them herein by reference.

44.     Chapwood had valid and reasonable contracts and business expectancies in its relationships with clients and others with whom Chapwood and Butowsky were in active discussions to do new business.

22

45.     The Defendants knew about Chapwood's contracts and reasonable business expectancies.

46.     The Defendants intentionally interfered with Chapwood's contracts and business expectancies by, *inter alia*, sending the letters to Chapwood's customers and former customers.   The Defendants' improper methods, actions and practices were fraudulent, defamatory, unethical, oppressive, over-reaching, hostile, and sharp.

47.     As a direct result of the Defendants' tortious interference with Chapwood's contracts and valid business expectations, Chapwood suffered damage and incurred loss, including, without limitation, injury to its property and business, loss of clients and business, loss of good will, increased administrative expense, damage to reputation, credit, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT IV – BREACH OF CONTRACT

48.     Chapwood restates paragraphs 1 through 47 of this Complaint and incorporates them herein by reference.

49.     Schwab intentionally breach the Agreement when Schwab sent the letters directly to Chapwood's clients and former clients.

50.     Schwab's breach of the Agreement caused Chapwood direct and consequential damage and loss, including, without limitation, injury to its property and business, loss of clients and business, loss of good will, increased administrative expense, damage to reputation, credit, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $100,000,000.00.

Chapwood and Butowsky allege the foregoing based upon personal knowledge, public statements of others, and records in their possession.  Chapwood and Butowsky believe that substantial additional evidentiary support, which is in the exclusive possession of the Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Chapwood and Butowsky reserve the right to amend this Complaint upon discovery of additional instances of the Defendants' defamation and wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Chapwood and Butowsky respectfully requests the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.     Compensatory damages in an amount to be determined by the Jury, but not less than $100,000,000.00;

B.     Punitive damages in the maximum amount allowed by Texas law;

C.     Prejudgment interest on the principal sum awarded to Plaintiff by the Jury from August 30, 2017 to the date of Judgment at the maximum rate allowed by law;

D.     Postjudgment interest at the maximum rate allowed by Texas law;

E.     Costs;

F.     Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:     April 20, 2018

CHAPWOOD CAPITAL INVESTMENT
    MANAGEMENT, LLC
ED BUTOWSKY

By:   */s/ Ty Clevenger*
        Ty Clevenger, Esquire
        Texas Bar No. 24034380
        P.O. Box 20753
        Brooklyn, NY 11202-0753
        (979) 985-5289
        (979) 530-9523 (Fax)
        Email:  tyclevenger@yahoo.com

        *Counsel for the Plaintiffs*

        Steven S. Biss (Virginia State Bar # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:    (804) 501-8272
        Facsimile:    (202) 318-4098
        Email:       **stevenbiss@earthlink.net**

        *Of Counsel for the Plaintiffs*
            *(Application for Admission Pro Hac Vice*
            *To be Filed)*